I see that you were appointed under the CJA to represent your client here. I am, Your Honor. We appreciate your willingness to take the case and work on it on behalf of Mr. Stephens. I appreciate it. It's an honor to be selected by the panel to be able to do this type of thing, and I appreciate and I'm humbled by it. So may it please the Court, Judge Malloy, Judge Kelly, and Judge Coates, thank you for hearing Mr. Stephen's case. I'm here today because Mr. Stephens was convicted in Iowa of three different felony convictions, two of them which did not stand under the Due Process Clause of the 14th Amendment under Henry Winship and under Jackson v. Virginia. I realize I'm here on a 2254 case, very tough case. As a defense attorney, when I work on a 2254 case, I often feel like a child always being told no. No, you can't do it. No, there's a default. No, you've got all these hurdles to go through. I understand the hurdles. I understand the reasonableness. I understand what I have to do in this case to convince this Court that two of the convictions that Mr. Stephens has been found guilty for are unreasonable and are not supported by the evidence. This is also an odd case in that Mr. Stephens is out on parole right now. I met with him last week. He's on parole until 2041. And I was meeting with him last week in my office. I go, well, what do you hope to get out of this? He goes, I want those two felonies off my record. These felonies keep me from traveling. I have a great job working for a roofing company. I can't work on military bases. I can't work for Facebook. I can't work on my roofing company. When I'm working for my roofing company, I can't work at certain places. I can only leave the state maybe two weeks at a time, and I have to get permission for that. So these are some of the reasons why he wants to lessen the grade of his criminal history. The Court really can't look back, but I can tell the Court that his prior criminal history goes back to 2003. I mean, that's one of the reasons the District Court tacked him so bad and gave him 60 years of sentencing, because he had a bad criminal history. But right now, when I'm meeting with Mr. Stephens, he's saying, I want to put my past in the past. I want to leave that stuff in 2003. I can deal with my one conviction for having two grams of meth in my back pocket, but the other two just aren't true. So as we look into the unreasonable application of federal law, which we say would be the in-ring win-ship in Jackson v. Virginia, and that application of conspiracy law, which is pretty well settled, as I compared the Iowa law to the federal law, they pretty much mirror each other with respect to meeting of the minds, can't really be guilt by association, can't be mere presence. But the only difference, there's two differences in Iowa law, is that Iowa required an overt act, and also one of the participants can't be a confidential informant working for the government or be a police officer. So in this case, as we look at the common ground here, which is the agreement for Mr. Stephens to be working with Mr. Scopa to manufacture methamphetamine, it just doesn't happen. And when this court looks at cases on conspiracy, what shouts out very loud is that there's a course of conduct. When you look for sufficiency of the evidence, the courts look for course of conduct. Were there calls? Were there meetings? Did I go buy something? Were there text messages? Were they seen together? What's so unique about this case is that it was a moment in time. So the only evidence that was presented about the relationship between Mr. Stephens and the driver of the car was the traffic stop. Was the traffic stop. The only other evidence would be admitted is that Scopa made some – Officer Parazic asked Scopa whether my client knew the batteries in the lithium were in the middle seat, and he said, I don't know. And he asked if Mr. Stephens had a weapon. He said, I don't know. So really, it's that moment in time when Officer Parazic pulls over Scopa's truck. And what's interesting about that, and that kind of segues me into the unreasonable application of facts. What's unreasonable about the facts in this case and how they were applied by the Iowa Court of Appeals, I guess, and the Supreme Court denying further review on it, and the district court and the federal court, is that this belief that somehow Officer Parazic saw my client making furtive movements to the middle seat stuffing in something. Really, when you look at the transcript, it's twice. He says, I'm following him. Mr. Stephens is going back and forth. I stop the vehicle. And then he's making furtive movements to go to hide something in there. I'm going to tell you why that's not reasonable. And the record supports it. Officer Parazic, and this is in the trial transcript, had been working midnight shift for 18 years. He pulled over this truck at 1.15 in the morning on a dark and murky road. That's his own testimony. So when he gets behind the vehicle, he's about three-quarters of a length behind. For his own safety, he gets out of his vehicle, walks around the back of his patrol car for safety, and comes up to the passenger side window. And then at that point in time, he's saying that I'm seeing Stephan messing or putting something down in there. So what would a reasonable police officer do? A reasonable police officer concerned about the destruction of evidence and a weapon being in there, he says, men, you need to get out of that car right now. Get to the back of this truck so I can run your IDs. Was there any other evidence that would have called into question the credibility of that version of events on the part of the officer other than sort of, wow, I just can't believe that that's what you would have done as a reasonable officer? In other words, was there testimony about him not actually being able to see your client because of some blocked vision or it was too dark? Or is there anything else that calls into question his credibility? I would say yes. He said he couldn't see what he was doing. And also that middle console part between the seats, he keeps calling it a console, between the seats, was reachable by Mr. Scopa too. But really, all we have is his word, what he saw, and whether that's a reasonable action by a police officer in the context of that time. It's one thing if it's noon and the sun's out and you can keep an eye on them at all times, but on a dark road at 115, to leave two men in there in that type of truck with all that stuff in the back of the bed and the junk on the inside, obviously a little concerned about these guys anyway. To leave them alone, it flies in the face of reason. And I believe that this court, based upon the power that it's given, can find that an unreasonable application of the facts. But by applying common sense to police officers' actions, how much deference the courts give to police officers is well-deserved. But sometimes, you know, it just doesn't make sense. And an 18-year-old officer, an 18-year veteran officer working nights does not leave the two men alone. And that's really... How did the officer explain that? I'm assuming on cross-examination. Well, Your Honor, he didn't because this was brought forth during trial. It wasn't in a suppression hearing. It wasn't in a motion to dismiss hearing. This was trial evidence calling into question what the officer saw. So really, there was no reason why the defense counsel would ask, well, why did you leave them alone if you were worried that it was drugs or worried about your safety? It wasn't a strategy for defense counsel at that time because it really wasn't probably relevant to what he was getting at to show reasonable doubt that just because my client is sitting in a vehicle with Mr. Scopa in his vehicle with this anhydrous tank in the back with hoses and a mask in the front and pliers and his receipts for buying pseudofedronate Walgreens a week or two before, just because I'm here, we want to prove that just because he's here doesn't mean guilt by association. That doesn't hold up by conspiracy law. So with that, Your Honor, as we also look into this one stop, this one moment in time, there's nothing else in the vehicle to attach Mr. Steffen and Mr. Scopa to have an agreement to manufacture methamphetamine. Justice Potterfield, and it's clear in my brief that I did at the district court, and then I did it in this case on appeal, Justice Potterfield hit the nail on the head. She's going, this was not a rolling meth lab. It had ingredients to make a meth lab. There's no evidence of an agreement between these two guys that they were going to take this evidence and manufacture meth with it. No evidence whatsoever. There was no fingerprinting on what was found in the back, on the mask, on the pliers, on the pseudofedron and the batteries. There's just no connection about inference and speculation, and that simply is not enough standing alone to warrant a conspiracy conviction. What about the, you said there was no other evidence. I thought that the statement made a big deal out of the fact that your client made a statement to the effect, I know I'm going to jail, I know this is going to put me in jail, or something to that effect. Was that statement made, and isn't that pretty compelling evidence that he knew he was at least in a lot of trouble? In context, it shows that he was in trouble, but you have to look when he made the statement. He had, Officer Perezek had already taken out the two grams of meth from his back pocket, and he was in the back seat of the patrol car at that time. So he had already been moved away from the truck, arrested, and put into the back of the patrol car, had meth in his pocket, and by the way, he was on parole at the time. I mean, that's right in the, I don't think it says that he was on parole on the record, but I guess if the court would look at the district court record and the present investigation that he had, the court would see that. But anyway, he's on parole, two grams of meth in his back pocket, has a long criminal history of drug-related offenses, and the court can take judicial notice of the trial information in this case. He's a habitual offender, and some of those offenses were prior drug offenses. So, I mean, I don't believe that that is an indication of guilt in context, that that type of admission would overweigh or show a guilty mind, that there was evidence that he knew this was going on. You raised an Eighth Amendment claim, and the fact that if he had been federally prosecuted, he probably would have gotten even more time, and the fact that he's now out on parole, is that got any legs to it? I mean, I never like to say no, you know, but I will say it probably doesn't have strong legs to it. I understand I do a lot of federal work, too, with mandatory minimums and stuff, and to have my guy out in those over eight years on parole doing wonderful is a godsend as far as I'm concerned. So, I'm not pushing that. I'll say I have weak legs on that. So, with that, if no more questions, I'll reserve my last three minutes. Thank you. Mr. Rogers? May it please the Court. Counsel, good morning. I just learned that it's Mr. Stephan, not Mr. Stevens, so I'll try to get that right. For all eight issues certified on this appeal, we submit that the state courts applied the governing federal law correctly. Would you agree this is a pretty weak conspiracy conviction? I mean, as these things go, I mean, what's the full scope of evidence? Well, the full scope of evidence is that Mr. Stephan was discovered in the pickup truck, and I think the reasonable inference that we have to on appeal and in the habeas review, he's stuck with that he was putting the precursors in between the seats, and it was stripped lithium batteries, and it was crushed pseudofedrin. It wasn't lithium batteries. It wasn't pseudofedrin. These things were ready to go. They're ready to put in the pitcher that was in the back of the truck with the anhydrous ammonia that I think is a reasonable inference was in the back of the truck, and he's there with another gentleman, Mr. Scopa, whose truck it is, and who I think the jury found Mr. Stephan didn't possess the anhydrous ammonia because he was acquitted of that count, so I think we look at the anhydrous ammonia is Mr. Scopa's, and the stripped lithium batteries and the crushed pseudofedrin is Mr. Stephan's, and from that we can infer that they had agreed to manufacture methamphetamine. They had the pitchers, as I mentioned. They had coffee filters. They were ready to do step one, as the criminalist Bremer testified. Step one of the manufacturing process is putting the anhydrous ammonia in with the lithium from the lithium batteries and mixing it with the crushed pseudofedrin, and then you're off and going. Do you need to find the officer credible? Is this all really contingent on believing the officer's testimony that he saw Mr. Stephan making movements as he was approaching the truck? I don't think on Jackson v. Virginia review making a credibility determination is for the Court of Appeals, and I don't think on 2254 on reasonable application it's a credibility determination. I think we have that as a reasonable inference that's drawn that the officer is credible. But do you need it? Putting aside that issue, if that weren't there, would the case be sufficient for a conspiracy between these two? If you didn't have the visual? If the officer didn't testify, he was stuffing something in between the seat or was making motions where it was found, I think it would be extraordinarily thin. On a Jackson v. Virginia review, I think that maybe it would be no reasonable fact finder could make that determination. But when you stack the unreasonable application standard on top of that, I think that it's probably close there, but with the deference that's given the state courts and that's given the jury verdict, I believe that even if you were to make the finding that it was an unreasonable finding of fact, I think that you could still affirm. But there isn't clear and convincing evidence that Officer Parizek was not credible in his description of Mr. Stephan making furtive movements as he was being pulled over and as he stood to the side of the truck watching him. I don't think the hindsight bias explanation here is clear and convincing evidence that he is not credible and that he did not see those furtive movements. An officer standing there watching somebody going into the seat or doing something down to his side and said that he was waiting to see if he came up with a weapon, I think that is a memorable moment for the officer and that jury can reasonably believe that he remembered that and credit that. Did the officer have his weapon drawn? Does the record show one way or the other? Because Mr. Dunn says, you know, if he was that concerned, he wouldn't have just gone back to his patrol car. And if he was actually, I assume an officer would draw his weapon if he thought that one might be coming out. But does the record show that? The record doesn't show that. He didn't say that he had his weapon drawn. That issue didn't really get addressed in post-conviction review. There wasn't a lot of testimony to that effect on his, why did he go back to the car? I think that's new for this case. And I don't know if it's unexhausted exactly, but it's something that the state court didn't have before and didn't have a chance to look at as far as I remember. So I think that if the officer was comfortable waiting to see if a weapon came up and his testimony was that the two men didn't notice him back behind there. So if he was waiting to see if he came up with a weapon, it's a reasonable inference that he would notice that and then decide whether to take his own weapon out. Was this Highway Patrol or Deputy Sheriff? It was, I believe it was Des Moines Police Department. Did they use cameras? In other words, is there a video of the stop? There is not a video of the stop. The testimony I believe was that car that he was driving didn't have the equipment at the time. If I'm remembering right, it's 2009 traffic stop. I think there were cars that did have the dash cams at that time, but this car did not. And to go back to the evidence supporting the conspiracy, he did, when he was put in the patrol car, say, I know I'm going to prison. There are other explanations for that, of course. As my friend Mr. Dunn said, he was on parole. He was found possessing methamphetamine. So he knew he was going back, but you could also take that to infer that we're busted. What did the co-defendant do? How did he resolve his case? My memory is that he pleaded guilty to one count, I believe, and got a probation sentence. He had no record then, presumably? That would be my presumption. And he did not offer any testimony or evidence against the co-defendant, Mr. Stephan? No, he didn't testify against Mr. Stephan. To go back to the additional evidence of the conspiracy, he did have the finished product in his pocket, the methamphetamine made from the lithium and ammonia process. So I think you could infer that he's at least familiar with that product. So the testing did show the origins of the meth itself, how it was made? Correct. The criminalist testified that it was a result from the ammonia and lithium and pseudoephedrine process. There was a respirator and a fume mask by his feet on his side of the truck. There was this tank with anhydrous ammonia, retrofitted, I guess, to be able to take it illicitly from anhydrous ammonia tanks. But that was only attributed to Mr. Scopa, right? Right. But it's in the truck, and they found him guilty of the conspiracy, so it's what Mr. Scopa said. I only pointed out, I know it's not relevant to this appeal, but the difference between a 60-year sentence and a probationary sentence for these two individuals in the same truck, and one is being attributed, having more of the ingredients attributed to him, and he's the one with probation. I realize that's not an issue here, but it's sort of a background fact. It does seem unbalanced, but we don't know Mr. Scopa's recidivist history, which Mr. Stephan had a long history, and he had the habitual offender sentence, of course, that got him the 15-year sentence instead of a Class C or Class D sentence, which is 5 or 10. And then he had the tripling from the second or successive offender provision. So that's where he got up to 105 potential, and I guess it would have been probably 150 potential if he would have been found guilty of the possession of anhydrous. But the district court did run the count one and count two concurrently, and then consecutive for the possession of methamphetamine. And comparing these cases to conspiracy cases that have been affirmed or reversed under Iowa law, there's the Spiker case where Mr. Spiker was standing outside of a garage smoking a cigarette, and the police smelled ether coming out of the garage, so they were observing. Spiker went back into the garage and came out, and then he and the owner of the garage fled. The Iowa Supreme Court said that that was insufficient evidence of a conspiracy between the two, and that's where the court said mere presence is not enough. But I would submit that that case is comparable to this one, only if Mr. Spiker had precursors to manufacturing methamphetamine that he discarded on his way out, and the police had seen that would be how that would be comparable. The Cassidy case is one where the Iowa Supreme Court found sufficient evidence of a conspiracy. Mr. Cassidy was found in the garage, and he had been observed stealing anhydrous ammonia previously, and he smelled of anhydrous ammonia, and the court said that that was sufficient evidence of a conspiracy. But as I mentioned, we're not on the Jackson v. Virginia review. We're on the doubly deferential review, and there are some admittedly thin cases that the U.S. Supreme Court has addressed, and I cited those. It's McDaniel v. Brown, which was a case of a sexual assault where the state court had said, without the DNA evidence, we don't have a conviction. There isn't sufficient evidence. The U.S. Supreme Court said you can't consider additional evidence of a second DNA test. You have to look at what was before the jury at the time, and that was the McDaniel v. Brown. Coleman v. Johnson is similar. There was not a lot of evidence of the state of mind there, but it was sufficient under the 2254 standard on top of the Jackson v. Virginia. So with that, unless there are other questions from the court, I would say neither state court decision at issue is so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement. I'd ask the court to affirm. Thank you, Mr. Rogers. Mr. Dunn. Thank you, Your Honors. I never like to do this in oral argument, but there's a mistake in the appendix. My page numbering is off in the table of contents by six pages. So if I cite to page 16, it's really 22. If I cite to page 35 in the brief, it's really 41. I apologize for that. Probably added something late and didn't tell who was helping me. With respect to the credibility of Officer Parizek, on page 65 of the appendix is where it talks about him getting out of the car, which goes to the credibility finding also, which isn't included in the appendix, is when he describes walking behind the car up to Skopa's vehicle. But that can be found in the trial transcript at page 165 to 166, and that can be found at the district court docket 13-1. The trial transcript was filed. Regarding the methamphetamine, the .2 grams found in his back pocket, I don't recall, but the record of the trial transcript will speak for itself. I don't think there was any testing done to determine a connection between the two grams in the back pocket and what was in the middle counsel seat. On page 93 and 94 of the appendix is when I think Nyla Bremer is testifying to the meth results, to the testing of the powder in between the seat and the two grams in his back pocket. I think his two grams in his back pocket was 57% pure, I guess which shows that this is an older case because now it's always so much stronger. Then also, Your Honors, with respect to a moment in time, I'm thinking this is kind of a moment in time case and what type of speculation or inferences you want to draw from it. In our brief, I direct the court to United States v. Jones, which we cited in our brief. That's 393 Fed Third 107. It's a Second Circuit case. That's kind of a moment in time case. That's probably the most similar that I could find as opposed to the course of conduct cases that we see that's so easy. It just takes a little bit of evidence in these course of conduct conspiracy cases to draw the connection. But I think in these moment in time cases when you're just looking at the tangible evidence, it's far more difficult and a far more stringent standard should be placed upon it before we hold somebody guilty to 45 years in prison. I'd also ask the court to find the evidence insufficient based upon the standards that we have to go through for the second count of lithium with intent to manufacture. That was count two. You also got 45 years for that, and that's really for the same reasons, the same inferences, the same speculation that supported the conspiracy are used for that second count of possession with intent to manufacture methamphetamine. For those reasons, Your Honor, I ask that the court issue a writ, vacate both counts one and two, and send this back to the state. Thank you for your time. Thank you both for your briefing and your argument. We'll take the matter under advisement.